Receipt #062897

ORIGINAL

ECF

FILED
MAY 13 2005
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Government Telecommunications, Inc.
4500 Southgate Place, Suite 300
Chantilly, Virginia 20151,

Plaintiff,

v.

The United States,

Defendant.

No. 05- 547C

## COMPLAINT

COMES NOW the Plaintiff, Government Telecommunications, Inc. (GTI), by counsel, and hereby asserts the following for its Complaint against the Defendant, the United States, acting through and by the United States Postal Service (USPS or Postal Service), and states as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491. GTI brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.* (CDA).

2. Pursuant to the CDA, 41 U.S.C. § 609, GTI brings this action directly to the United States Court of Federal Claims within 12 months of the imputed "deemed denied" date of the Contracting Officer's Final Decision.

## PARTIES

3. The Plaintiff, GTI, is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Chantilly, Virginia. Among

other things, GTI contracts with various United States governmental agencies, including the Postal Service, for the design and installation of electrical and telecommunication equipment infrastructure. One of GTI's specialties is the performance of such installation on multiple, geographically diverse, locations. GTI is a wholly owned subsidiary of Computer Equity Corporation. Computer Equity Corporation is a wholly owned subsidiary of Applied Digital Solutions, Inc., headquartered in Delray Beach, Florida.

4. The Defendant is the United States, acting through its agency, instrumentality, and/or agent, the Postal Service.

## NATURE AND SUMMARY OF ACTION

5. This action is brought by GTI pursuant to the provisions of the CDA, 41 U.S.C. § 609, seeking recovery against the government for the additional costs incurred by GTI in performing Contract No. 3AAERD-03-P-6080 (the Contract) with the Postal Service associated with (a) the un-reimbursed quantities of Program/Onsite Project Management, and (b) Phase II option Contract Line Item Number (CLIN) re-pricing. The amounts claimed by GTI are $4,949,421 for the un-reimbursed quantities of Program/Onsite Project Management and $793,415 for the Phase II option CLIN re-pricing. The total amount claimed by GTI in this action is $5,742,836, plus interest as allowed under the CDA.

6. This action is related to Civil Action Nos. 05-463C and 05-491C, which were filed by GTI on April 11 and 22, 2005, respectively.

## STATEMENT OF FACTS

### *Contract Award and Overview*

7. On April 7, 2003, the USPS issued RFP 3AAERD-03-A-1200, accompanied by a statement of work (SOW) defining the requirements for upgrading the existing baseband local

area network wiring at up to 62 mail processing plants (sites) and 12 co-located administrative networks to meet current wiring standards for "USPS structured wiring." These initial 62 sites came to be known as the "Phase I" sites. The additional 88 sites added via Amendment 2 to the solicitation on April 24, 2003 came to be known as the "Phase II" sites. The procurement was conducted under USPS competitive procedures, terms, and conditions. Eight contractors were solicited.

8. According to the SOW, the scope of work for this program, termed the Mail Processing Infrastructure or MPI program by USPS, included pre-installation, installation, and post-installation activities necessary for successful structured wiring implementation.

9. Proposals were initially submitted on May 5, 2003. On June 4, 2003, GTI was notified by the Postal Service that it was one of the finalists for award. On June 20, 2003, the Postal Service notified all bidders that the award of the Mail Processing Infrastructure (MPI) Contract had been made to GTI.

10. GTI experienced a number of occasions during the course of performance where it incurred additional costs due solely to the actions, inactions, or decisions of the Postal Service and for which GTI, pursuant to the terms of the Contract or otherwise, is entitled to an upward adjustment in Contract price. Two of these categories for which GTI is entitled to recover are the unreimbursed quantities of Program / Onsite Project Management and Phase II option CLIN re-pricing, as discussed more fully below.

*Factual Background - Program/Onsite Project Management*

11. The work required by the Contract "includes pre-installation, installation, and post installation activities necessary for successful structured wiring implementation." Two of those necessary "pre-installation, installation, and post installation activities" are Program

Management and Project Management, which are called out and identified in a single CLIN entitled "Program/Onsite Project Management." The Program/Onsite Project Management CLIN (hereinafter, the "Program Management CLIN") is a fixed unit-priced CLIN, with the unit period designated as a "week."

12. The term "Onsite Project Management" is self-explanatory: the term refers to supervisory, oversight, and support efforts expended by the contractor at each site as a necessary element of performing the MPI installation work.

13. The term "Program Management" is a term of art that has been defined as "doing for the owner what it would do for itself if it had the in-house capacity or if it chose to divert its resources to the project(s)." As a general proposition, then, a Program Manager assumes certain tasks and roles that otherwise would be assumed and performed by the owner. Further, according to the commentators, Program Management is particularly useful where the project: (a) utilizes the design/build contract delivery method; (b) involves multiple sites; and (c) requires the upgrade of existing operational facilities.

14. A Program Manager's tasks may include, among other things: (a) assisting in site evaluation, selection, and acquisition; (b) managing the investigation and documentation of existing site conditions; (c) developing a strategy for procuring design and installation services; (d) developing design criteria, drawing and CAD standards, and specification formats; (e) administering contracts, processing payments and changes, and reviewing and approving services and work; (f) designing and managing a system of job meetings, communications, document flow, and recordkeeping; (g) producing and maintaining a master project schedule; (h) monitoring safety and quality assurance programs; (i) staffing and administering jobsite and other project offices, and providing facility management and human resource services for these

offices; (j) developing and administering a materials testing program; and (k) administering contract closeout activities.

15. The MPI project reflected all the hallmarks of a project that would stand to benefit from tasking the prime contractor with Program Management responsibilities: the project involved 170 separate sites, it required the upgrade of existing operational facilities, and it utilized the design/build contract delivery method. Presumably, the Postal Service included in the RFP a Program Management CLIN precisely because the MPI project presented these features.

16. When developing its proposal, GTI reasonably interpreted the Program Management CLIN to embrace the commonly accepted suite of Program Management tasks that included as one element onsite Project Management. GTI also reasonably interpreted the Program Management CLIN as encompassing both on-site and off-site program management activities, as evidenced by its descriptions in its technical proposal of Program Management activities encompassed with the Program Management CLIN.

17. In particular, GTI's technical proposal explained that on-site Project Management was but one distinct component of its overall on-site and off-site Program Management plan. In fact, GTI's technical proposal explained that Program Management actually encompassed six broad categories of activities: (a) Project Technical Engineering; (b) Project Management (for each site); (c) Materials Management; (d) Program Support; (e) Quality Assurance, and (f) Finance. Many of these activities (Materials Management, Program Support, and Finance) were *off-site* activities; some were both *on-site* and *off-site* activities (Project Technical Engineering and Quality Assurance); and one (Project Management) was primarily an *on-site* activity.

18. For example, GTI expressly stated that "Program Support" was to be performed by "a full-time program management support team residing at GTI headquarters," thus indicating an off-site activity. Similarly, GTI described its Materials Management as an off-site activity, stating that GTI used "[a] centralized procurement approach" that "allows all site managers to work with a single point of contact at GTI . . . ."

19. In addition, GTI explained that its Project Management activities were primarily on-site activities, stating that "[e]ach medium and large site will be assigned a full-time Site Manager" and that such site managers "will be re-deployed and used on subsequent site installation[s] throughout the life of the project." The reasonableness of this interpretation is demonstrated by the Postal Service's inclusion of and payment for both off-site program management and on-site project management activities for sites completed prior to Contract termination.

20. Thus, both the Postal Service and GTI contemplated that all necessary Program Management and Project Management activities — regardless of whether they were on-site or off-site — would be included under the Program Management CLIN.

21. That both on-site and off-site performance of Program Management activities were contemplated also can be gleaned from a plain reading and parsing of the term "Program/Onsite Project Management," the phraseology used in the Program Management CLIN. To interpret Program Management work as restricted to on-site performance would improperly render the term "*Program* . . . Management" superfluous.

22. The Contract does not expressly define a pre-determined period for the Project Management CLIN. Instead, the Contract requires the contractor to provide "pre-installation, installation, and post installation activities necessary for successful structured wiring

implementation." Thus, the Contract itself contemplates that activities encompassed within the Program Management CLIN would commence — and indeed *must commence* — "pre-installation" and continue through to the "post installation" time frame.

23. Both the Postal Service and GTI have demonstrated by their actions that they similarly contemplated that Program Management CLIN activities would commence before installation and continue through to sign-off. The Postal Service included both pre-installation and post-installation Program Management CLIN activities in the approved schedules. These actions implicitly acknowledge the pre-installation to post-installation duration of Program Management CLIN activities.

24. Similarly, GTI reasonably interpreted the Contract as requiring pre-installation, installation, and post-installation Program Management CLIN activities – and specifically that such activities were required from before the start of site survey work through sign-off. GTI held this interpretation of the Program Management CLIN from the outset, as shown by its technical proposal. GTI's technical proposal explained that GTI's Program Management activities encompassed eight specific categories of work that started no later than commencement of site survey work and ended only upon sign-off.

25. For instance, GTI explained that its Program Management activities would include the following, among others: (a) finalize and detail all engineering plans and recommendations, perform ISO quality assurance verification and validation of the designs; (b) complete implementation of the program (consisting of site surveys, engineering, drawings, the installation of all cable and wiring infrastructure and training required) within USPS schedules and ongoing priorities; and (c) assume responsibility for all contract requirement deliverables including contract compliance, activity coordination, material staging and testing, logistical

resource assignments, implementation, verification and validation and ongoing technical support to USPS. These activities arise along the project timeline from no later than the start of the site survey ("this activity [includes] site surveys") to sign-off ("verification and validation").

26. GTI's Technical Proposal also expressly contemplated that Program Management activities would continue through sign-off:

> To ensure . . . issues are properly considered and resolved prior to manifestation as serious problems, the Program Manager will hold site review meetings *from the beginning of each install*, with site management and client representation *to ensure each site's unique needs are incorporated during the installation and close out phases.*

Thus, as discussed in GTI's proposal, Program Management activities continued through to "close out."

27. GTI's Technical Proposal also explained that *Project* Management activities – a separate and distinct component of *Program* Management – would commence no later than the site survey and continue through to close out:

> Each medium and large site will be assigned a full-time Site Manager to control the installation from beginning to end. [Two smaller sites may be assigned to a single manager.] The site managers are required to participate in all aspects of scheduling (e.g., site surveys, materials receipt, install team arrival, quality review, [and] client close-out walkthroughs, etc.), and act as the prime customer site contact for customer relations.

28. GTI's approach (as stated in its Technical Proposal) of providing Program Management CLIN activities over the life of each site was both reasonable and consistent with the SOW's requirement that GTI provide all the "pre-installation, installation, and post installation activities necessary for successful structured wiring implementation."

29. GTI's approach of providing Program Management CLIN activities over the life of each site also is consistent with the commonly understood description of the Program

Management work scope as including activities that run from site evaluation to project closeout. Accordingly, GTI's interpretation is consistent with industry practice, as well.

30. While the Contract itself placed no limitation on period over which Program Management CLIN charges could be made, the Postal Service early on directed that GTI employ the rule of thumb convention in estimating Program Management CLIN quantities and thereafter held it to those quantities when paying GTI for the work performed. Specifically on July 23, 2003, the Postal Service convened a meeting at GTI to discuss how to handle the task orders, including estimating the quantities of Program Management CLIN activities. This meeting was held before GTI performed any Phase I site installation work and before GTI had any experience with the way the Postal Service would handle pre-installation and post-installation activities.

31. At the request of the Postal Service at that July 23rd meeting, it was decided that GTI would prepare estimates using the 7-9-11 rule of thumb as an administratively convenient estimating tool. That approach assumed that, for Merrifield-like facilities, GTI could perform the installation on small sites in 5 weeks, medium sites in 7 weeks, and large sites in 9 weeks, and, more importantly, that GTI would only need one week for pre-installation and one week for post-installation activities. With certain exceptions, GTI used the 7-9-11 rule of thumb estimating convention when submitting estimates for the majority of the Phase I sites.

32. During Phase IIa, after it became clear that the 7-9-11 "rule of thumb" quantity estimates for the Program Management CLIN were not reasonable, GTI no longer applied this convention in preparing estimates and submitting invoices. The Postal Service, however, limited payment on GTI's invoices to the 7-9-11 rule of thumb convention, regardless of the original estimate or actual quantity.

33. The Postal Service made clear throughout Phase I that it would not approve GTI to start work on any site if an estimate varied from the 7-9-11 rule of thumb. In order to obtain payment, GTI was directed to submit an invoice for payment only after "sign off" and only for the estimated CLIN amounts that had been submitted to the Postal Service prior to installation under the 7-9-11 rule of thumb. In Phase IIa, the Postal Service directed GTI to proceed with installation even though GTI estimates included quantities for Program Management CLIN that were based on actual experience to date and higher than the 7-9-11 convention.

34. Notwithstanding the estimates, both parties understood that GTI would later seek payment of the full quantities of the Program Management CLIN incurred in performance. Neither GTI's invoices nor any other documents associated with payment evidenced any intent by either party that such invoices were final invoices, or that payment received constituted final payment for any site. GTI never waived its right to recover its full quantities of Program Management nor acquiesced in the Postal Service's arbitrary, unilateral, and crabbed interpretation of the appropriate period over which Program Management charges should apply. GTI is thus entitled to payment of the full quantity of Program Management CLIN incurred in the performance of the Contract.

35. On January 7, 2005, GTI submitted to the Postal Service a Request for Equitable Adjustment (REA) seeking an amount of $4,949,421 for un-reimbursed quantities of Program/Onsite Project Management incurred by GTI in performing the Contract.

36. Despite GTI's multiple invitations to meet and discuss this REA, USPS failed and refused either to meet or discuss the matter.

37. Having reached a constructive impasse in the REA contract administration process, GTI on March 8, 2005 re-filed the REA as a claim under the CDA and formally

requested a Contracting Officer's final decision thereon. Since that filing, more than 60 days has elapsed without the Contracting Officer's issuance of a final decision or a Contracting Officer's request for more time within which to issue a final decision. As such, GTI's certified claim on the REA issues is deemed denied. *See Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298 (Fed. Cir. 1996).

*Factual Background - Phase II Option CLIN Re-Pricing*

38. The solicitation that led to GTI's contract originally did not contain any option provision. Amendment 1 to the Solicitation, added the following option clause, Clause 2-18, entitled "Option Item (January 1997):"

> The Postal Service may increase the quantity of supplies called for in this contract by requiring the delivery of the numbered line items identified in the Schedule as an option item, in the quantity and at the price set forth in the Schedule. The contracting officer may exercise this option, at any time within the period specified in the Schedule, by giving written notice to the supplier. Delivery of the items added by the exercise of this option will continue immediately after, and at the same rate as, delivery of like items called for under this contract, unless the parties otherwise agree.
>
> Incorporate the following OPTION items into the Bid Schedule. The Postal Service intends to install wiring in accordance with the same SOW at ____ [sic] additional sites and in the following quantities. Note that funds are not yet available and may not become available. The Postal Service may execute this option at any time during the performance period of the contract as now constituted or within such time as the two parties may agree by supplemental agreement.
>
> THE PRICES FOR THIS OPTION WILL BE INCLUDED IN THE PRICE EVALUATION OF THE BASE CONTRACT AND THE COMBINATION OF THE TWO WILL SERVE AS AN EVALUATION BASIS FOR AWARD.
>
> On Pages 3-5, 3-7 change the word "OPTIONS" where it is found to "OPTION 001."
>
> Add Pages 3-11 through 3-19. These pages are the bid schedule for the ESTIMATED 88 Phase II sites.

Amendment 1 page 2 (emphasis in original).

39. When it submitted its proposal, GTI acknowledged Amendment 1, agreed with its provisions, and advised the Postal Service that it did not take any exception to such provisions. GTI's proposal expressly stated that "GTI understands the terms and conditions as specified under RFP Section 3.8 – Clause 2-18 Option Item (January 1997) and will comply with all requirements."

40. When it awarded the Contract on June 20, 2003, the Postal Service identified the base quantities of the Contract as those set forth in CLINs 0142-0282 and 0565-0577 and identified CLINs 0424-0564 as the "Option Items:"

> **C. Line Items Included in the Award.**
>
> The Postal Service accepts the contractor's final offer only on items relating to Category Six wiring. That is to say the funded contract award is only for Items 0142 – 0282. The Postal Service also includes Option Items for Category Six wiring in the contract but is not yet exercising these Option Items identified in Items 0424 – 0564.
>
> The Postal Service hereby accepts Items 0565 – 0577 for inclusion in the contract. These Items will be in effect throughout the term of the contract, including the additional term for any option items.
>
> The Contract Line Item schedule attached reflects the above changes.

*Contract Award Data Sheet, Contract 3AAERD-03-P-6080, page 3.*

41. The Contract did not separately specify a period of performance, but Part 1 of the Contract stated that the "Delivery Date" for the 62 Phase I sites was "06/30/2004." *Contract, page 2* ("Part 1 – COVER SHEET AND SCHEDULE"). Accordingly, since the Contract required delivery of 62 sites within a period of approximately 12.3 months, the Contract contemplated a delivery rate of 5.0 sites per month.

42. The Postal Service modified the Contract numerous times using both unilateral and bilateral modifications. Modification 1, a bilateral modification, added the IDIQ clause to the Contract but did not seek to modify the Option Item clause. The Postal Service then added various CLINs to the Contract in unilateral Modification 2 (adding CLINS 0578-0594 and 0701-0748), Modification 3 (adding CLINs 0595-0616), Modification 5 (adding the MPI network at Merrifield), Modification 8 (adding Bolger Center CLINs), and Modification 9 (adding Brentwood CLINs). In Modifications 4 (dated September 2, 2003) and 6 (dated October 28, 2003), the Postal Service issued revised schedules that added new CLINs (CLINs 0749-0763) and included all CLINs added by unilateral modifications as of the dates of the two modifications. Modification 5 definitized the Merrifield project; Modification 10 added funds to complete the Dewey Building; and Modification 12 dealt with hazardous materials issues. Modification 11 added CLINs for site survey work for Phase II sites.

43. In Modification 13, issued unilaterally and received by GTI on June 1, 2004, the Postal Service purported to exercise the option. The modification provided as follows:

> This Modification implements the Phase 2 option envisioned in the clause of the contract entitled 'Line Items Included in the Contract,' by incorporating all previously existing MPI and administrative Line Items 0424-0765 for Phase 2 MPI. Consistent with the exercise of this option, the period of performance is extended to August 31, 2005.

Modification 13, page 1. At the time it issued Modification 13, the Postal Service issued a schedule showing 108 sites in Phase II, instead of the 88 sites referenced in the Option Item clause. Subsequent schedules continued to show 108 sites.

44. In August 2004, GTI notified the contracting officer that it did not believe there was an option in the Contract as exercised by the Postal Service. In later correspondence and meetings, GTI reiterated its belief that the Option Item clause was improperly exercised.

45. On January 4, 2005, GTI submitted to the Postal Service an REA seeking an amount of $793,415 for the additional costs associated with Phase II option CLIN re-pricing.

46. Despite GTI's multiple invitations to meet and discuss this REA, USPS failed and refused either to meet or discuss the matter.

47. Having reached a constructive impasse in the REA contract administration process, GTI on March 7, 2005 re-filed the REA as a claim under the CDA and formally requested a Contracting Officer's final decision thereon. Since that filing, more than 60 days has elapsed without the Contracting Officer's issuance of a final decision or a Contracting Officer's request for more time within which to issue a final decision. As such, GTI's certified claim on the REA issues is deemed denied.

## COUNT I

### Equitable Adjustment: Failure to Issue an Equitable Adjustment for Full Quantities of Program Management During Phase I and Phase IIa

48. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 47 as if fully set forth herein.

49. The Contract provides that the Postal Service will pay GTI for all "pre-installation, installation, and post-installation activities necessary for successful structured wiring implementation." Because Program Management activities are required to be mounted and maintained by GTI throughout the entire period of project performance, the period defined as including "pre-installation, installation, and post-installation activities" applies to Program Management charges as well.

50. Of importance, the Contract does not limit the payment of the Program Management CLIN ($3,950 per week) to any particular number of weeks; rather, Program

Management charges are a function of the duration of the underlying MPI site installs. If the underlying MPI site work takes less time than expected, GTI applies the Program Management CLIN unit rate over a fewer number of weeks and GTI gets paid less. Conversely, if the underlying MPI work takes longer than expected, GTI applies the Program Management CLIN unit rate over a greater number of weeks and gets paid more. Payment for the Program Management CLIN is simply a weekly charge corresponding with the time required to perform the underlying site MPI work; nothing more, nothing less.

51. If the Postal Service was not pleased with the expected level of Program Management CLIN charges at any given site, it was free to delete this work via a deductive change or partial termination for convenience and either self-perform the Program Management CLIN or assume any resulting deficiencies arising from the non-performance of this work. The one option that was not available to USPS, however, was to not pay GTI for full quantities of Program Management after GTI had incurred those costs and performed that work.

52. The fact that the Program Management CLIN quantity for a given site exceeded the 7-9-11 rule-of-thumb estimate for that site is irrelevant because the estimates were developed for planning purposes only and were never intended to serve as not-to-exceed ceilings. Likewise, to the extent that actions, inactions, or other conduct of GTI delayed any given site install – and GTI vigorously contends that it *did not* delay the completion of any site beyond its as-planned finish date – that, too, is an inadequate basis for reducing or limiting payment on the full quantities of Program Management charges due GTI under the Contract. The Program Management CLIN charge is a straight formulaic computation for which the *only* unknown variable is the actual duration over which Program Management activities were being performed.

Once the actual performance duration is identified, the Program Management charges immediately become fixed and payable.

53. For the Phase I sites, USPS underpaid the Program Management CLIN by $2,859,433. For the Phase IIa sites, USPS underpaid the Program Management CLIN by $2,013,301. Additional allowable costs include REA preparation costs and GTI's fee that together total $76,687. Summing up, the total amount sought in the administrative REA and claim submission process amounted to $4,949,421. This pricing is inherently conservative and understated in that GTI begins the calculation of the Program Management performance periods at the *start* of the site survey activity; whereas, in actuality, considerable Program Management functions were performed *in advance* of the conduct of the site surveys.

54. The Postal Service has failed and refused to pay GTI any money in response to GTI's administrative REA and claim submission process. As a direct and proximate result of USPS' wrongful failure to issue an equitable adjustment for $4,949,421, GTI has sustained damages in this amount.

55. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests that the Court enter judgment against the Postal Service on Count I in the amount of $4,949,421, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT II

### Equitable Adjustment: Failure to Issue an Equitable Adjustment for Constructive Changes Resulting in an Underpayment of Full Quantities of Program Management During Phase I and Phase IIa

Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 55 as if fully set forth herein.

56. The 7-9-11 rule-of-thumb estimating convention for the Program Management CLIN estimated quantities was not achieved primarily because of changes and changed conditions that made the Program Management process more complex and more difficult than reasonably anticipated. At the time GTI employed the 7-9-11 estimating convention, GTI believed the rule-of-thumb timeframes were reasonable estimates for Merrifield-like sites, assuming that GTI would be allowed to perform in conformance with the Contract.

57. GTI's assumption was reasonable and consistent with its past experience with the Postal Service under the WACS contract. For the eight WACS contract sites, GTI typically spent one day conducting a site visit and one day preparing an installation schedule. GTI then submitted its installation plan to the Postal Service and received approval within one or two days. After installation was completed, the Postal Service usually signed-off and GTI completed clean-up activities within approximately one week. There was no reason for GTI to believe that contract administration would differ on the MPI Contract.

58. Indeed, the reasonableness of GTI's expectation regarding Program Management CLIN activities was confirmed by the Contract itself. Section E.1 of the Contract provided for the USPS to review and approve Initial Site Distribution Designs within seven days after the site survey, which was consistent with GTI's experience on the WACS Contract. Accordingly, when GTI employed the 7-9-11 estimating convention in late July 2003, GTI reasonably expected that – in addition to on-site Project Management – it would need approximately one week of Program Management time before installation and approximately one week of Program Management time after installation to complete the work.

59. Specifically, at the time the parties started using the 7-9-11 rule of thumb, GTI assumed that the Postal Service would administer the Contract in a manner that would allow GTI to complete the necessary Program Management CLIN activities within the 7-9-11 timeframes. GTI assumed the Postal Service would do nothing to complicate the approval processes or to hinder GTI's ability to complete the projects within such timeframes. GTI was entitled to make this assumption, since USPS had a legal duty to not delay, hinder, or interfere with GTI's work.

60. GTI's actual experience under the Contract was vastly different from the assumptions that underpinned the 7-9-11 rule-of-thumb estimating convention. The Program Management CLIN activities lasted significantly longer than GTI could have expected from its previous WACS Contract and from the terms of the MPI Contract. The primary reason for the extended time schedule was that the Postal Service administered the Contract in a way that was fundamentally different from GTI's previous contracts and not in accord with the Contract terms.

61. Even though the Postal Service had only allowed GTI one week for pre-installation and one week for post-installation activities under the 7-9-11 rule-of-thumb estimating convention, the Postal Service made the pre-installation and post-installation activities more onerous than anticipated and stretched them well beyond that given time limit or any reasonable time that GTI could have expected from the Contract.

62. Among other things, the Postal Service added a requirement that GTI coordinate its work with Postal Service consultants; it imposed additional reporting requirements on GTI; it required GTI to deal with design issues that should have been resolved well prior to contract award; it required GTI to deal with unanticipated security clearance, site survey, and site complexity issues; and it extended the pre-installation and post-installation phases of the site

work through unnecessarily prolonged negotiations of Initial Design proposals (often over trivial items) and extra-contractual acceptance procedures.

63. For example, contrary to the terms of the MPI Contract and the experience on the WACS Contract, the pre-installation "evaluation and approval" of the initial design was delayed considerably by the Postal Service (specifically the Raleigh engineers), many times over details and trivial issues that should have not held up performance. Even though the MPI Contract was based on a proven design, GTI was required to submit several revisions of the design on several sites to the Raleigh engineers. The MPI Contract did not provide for such back-and-forth, and neither had GTI ever had this experience during the WACS Contract.

64. In addition, the 7-9-11 estimating convention was not achieved because of delays and complexities added to the final acceptance process that did not become apparent until well after GTI started employing the estimating convention. In Phase I, the length of time from final inspection to sign-off averaged four weeks instead of the one week GTI reasonably expected based on its previous experience. These delays were a result of a wide variety of acceptance criteria applied by the Postal Service and its contractors, including an ever-changing standard for approval of CAD drawings.

65. As set out in Count I of this Complaint, GTI is entitled as of right under the Contract to be paid for the full quantities of the Program Management CLIN it incurred, without any requirement to show that the Postal Service caused these delays in pre- and post-installation activities. However, in the alternative, these inconsistent standards and the addition of extra duties to obtain final acceptance entitle GTI to an equitable adjustment under the constructive change doctrine. The delays resulting from these constructive changes forced GTI to extend its Program Management coverage over this delayed period on a day-for-day basis.

66. For the Phase I sites, the foregoing constructive changes resulted in the underpayment of the Program Management CLIN by $2,859,433. For the Phase IIa sites, these constructive changes resulted in the underpayment of the Program Management CLIN by $2,013,301. Additional allowable costs include REA preparation costs and GTI's fee that together total $76,687. Summing up, the total amount sought in the administrative REA and claim submission process amounted to $4,949,421.

67. The Postal Service has failed and refused to pay GTI any money in response to GTI's administrative REA and claim submission process. As a direct and proximate result of USPS' wrongful failure to issue an equitable adjustment in this amount, GTI has sustained damages in the amount of $4,949,421.

68. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Count I, that the Court enter judgment against the Postal Service on Count II in the amount of $4,949,421, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT III

### Breach of Contract: Failure to Issue Equitable Adjustment and Modify Contract for Full Quantities of Program Management During Phase I and Phase IIa

69. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 68 as if fully set forth herein.

70. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue GTI an equitable adjustment and modify the Contract under the "Changes" clause for full quantities of Program Management during Phase I and Phase IIa.

71. The Postal Service materially breached the Contract by failing to issue an equitable adjustment for full quantities of Program Management during Phase I and Phase IIa.

72. As a direct and proximate result of USPS's breach of Contract, GTI has sustained damages of $4,949,421.

73. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Count I, that the Court enter judgment against the Postal Service on Count III in the amount of $4,949,421, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT IV

### Breach of Contract: Failure to Issue Equitable Adjustment and Modify Contract for Constructive Changes Resulting in Underpayment of Program Management During Phase I and Phase IIa

74. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 73 as if fully set forth herein.

75. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue GTI an equitable adjustment and modify the Contract under the "Changes" clause for constructive changes that would have extended the period of performance and would have resulted in payment of full quantities of Program Management during Phase I and Phase IIa.

76. The Postal Service materially breached the Contract by failing to issue an equitable adjustment for these constructive changes.

77. As a direct and proximate result of USPS's breach of Contract, GTI has sustained damages of $4,949,421.

78. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Count II, that the Court enter judgment against the Postal Service on Count IV in the amount of $4,949,421, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT V

### Equitable Adjustment: Failure to Issue an Equitable Adjustment for Additional Costs Associated With Phase II Option CLIN Re-Pricing

79. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 78 as if fully set forth herein.

80. An option is a contract to keep an offer open for a prescribed period, during which period the offer is irrevocable. The party granting the option forgoes any opportunity to avoid performance and will be required to perform according to the terms of the offer in the event the option holder accepts it. Because the party granting the option relinquishes the right to avoid performance if the option is exercised, courts and boards construe the attempt to accept the terms offered under the option strictly.

81. This rule of strict construction requires that the notice by which the power of an option holder is exercised be unconditional and in exact accord with the terms of the option.

Attempts to exercise an option that do not comply exactly with the terms of the option, including attempts that might otherwise substantially comply with such terms, are insufficient and render the exercise invalid.

82. One such category of non-conforming exercise is where the option holder seeks to introduce though the exercise of the option work or conditions that are in addition to or different from those described in the option clause. A closely related category of non-conforming exercise is where the exercise purports to change delivery rates applicable to the option work scope. Courts and boards consistently have held that use of the option clause for these purposes invalidates the exercise. And, in cases of doubt, the Government carries the burden of proof to show that the exercise was proper.

83. The Postal Service's flawed exercise of the option varied from the terms of the Option Item clause in at least three principal ways. The first way in which the exercise of the option varied from the terms of the Option Item clause is that the Postal Service sought to include within its exercise of the option CLINs that were not part of the Option Item clause. The contract option included only CLINs 0424-0577, but the Postal Service included CLINs 0578-0765—nearly 200 extra CLINs that were not in the Option Item clause.

84. The second way in which the exercise of the option varied from the terms of the Option Item clause is that the Postal Service sought to include within its exercise of the option sites that were not part of the Option Item clause. The clause referred only to "the ESTIMATED 88 Phase II sites," but the Postal Service's option exercise sought to include 108 sites, which was a material change in excess of 20%.

85. The third way in which the exercise of the option varied from the terms of the Option Item clause is that the Postal Service sought to include within the exercise of the option

an increase in the delivery rate that was not part of the Option Item clause. The Contract required delivery of 62 sites in 12.3 months – equating to a delivery rate of 5.0 sites per month, and the Option Item clause provided that the "same rate" was to apply to the option quantities. But the option exercise sought to require delivery of 108 sites in 14 months – equating to an increased delivery rate of 7.7 sites per month. This would have had the effect of improperly increasing the delivery rate by over 50%.

86. Because the Postal Service's purported exercise of the Option Item clause included additional CLINs, additional sites, and a materially changed delivery rate, the option exercise was not in exact accord with the terms of the option and was therefore invalid. Indeed, any one of these deficiencies by itself would be sufficient to invalidate the option exercise.

87. In addition, the attempted option exercise was invalid because Modification 13 did not cite or rely on the Option Item clause as authority for the purported option exercise. Instead, the modification stated that it "implement[ed] the Phase 2 option envisioned in the clause of the contract entitled 'Line Items Included in the Contract.'" The cited "Line Items" clause does not set forth any option but rather states only that "The Postal Service also includes Option Items for Category Six wiring in the contract but is not yet exercising these Option Items identified in Items 0424-0564." Given that option exercises are strictly construed, Modification 13 did not actually exercise the Option Item clause of the Contract, since the "Line Items" Clause is not the Option Item clause and did not set forth any actual option.

88. Because the Postal Service's exercise of the option was ineffective in the four ways described above (additional CLINs, additional option sites, changed delivery rate, and failure to invoke Option Item clause), all of GTI's work on Phase II has effectively been

converted to cost-reimbursable work, entitling GTI to recover all costs of performance plus a reasonable profit on that work.

89. Furthermore, *none* of the 300+ CLINs called out in Modification 13 apply to the Phase II sites, not even the CLINs that were set out in the Option Item clause and could have been exercised properly. This would apply regardless of whether or not the Postal Service could have validly exercised the option for such CLINs by limiting its exercise solely to the CLINs specified within the Option Item clause. Indeed, GTI would not be bound by *any* of the prices for the CLINs purportedly included within the option exercise (CLINs 0424-0765). GTI would instead be entitled to recover its full actual costs of performance plus a reasonable profit on those costs.

90. GTI incurred additional costs associated with the CLIN re-pricing amounting to $760,829 for various CLINs for work performed at 37 Phase IIa sites. Additional allowable costs include the REA preparation costs and GTI's fee that together total $32,586. Summing up, the total amount sought in the administrative REA and claim submission process amounted to $793,415.

91. The Postal Service has failed and refused to pay GTI any money in response to GTI's administrative REA and claim submission process. As a direct and proximate result of USPS' wrongful failure to issue an equitable adjustment for $793,415, GTI has sustained damages in this amount.

92. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests that the Court enter judgment against the Postal Service on Count V in the amount of $793,415, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT VI

### Breach of Contract: Failure to Issue an Equitable Adjustment and Modify the Contract Under the Changes Clause for Additional Costs Associated With Phase II Option CLIN Re-Pricing

93. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 92 as if fully set forth herein.

94. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue to GTI an equitable adjustment and modify the Contract under the "Changes" clause for the incremental cost of the Phase II CLINs arising from USPS's improper exercise of option pricing for this work.

95. The Postal Service materially breached the Contract by failing to issue an equitable adjustment for these additional costs.

96. As a direct and proximate result of USPS's breach of the Contract, GTI has sustained damages in the amount of $793,415.

97. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Count V, that the Court enter judgment against the Postal Service on Count VI in the amount of $793,415, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

Dated: this 13th day of May 2005.

Respectfully submitted,

**Government Telecommunications, Inc.**

By Counsel:

John C. Person, Esquire
PERSON & CRAVER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 466-4434 – phone
(202) 466-4416 – fax
jcperson@perscrav.com

Attorneys for Plaintiff

Of Counsel:

Michael Krawitz, Esq.
General Counsel, Applied Digital